[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-10523

_____

WARRIOR MET COAL MINING, LLC,

Plaintiff-
Counter Defendant-
Appellee,

*versus*

UNITED MINE WORKERS OF AMERICA,
DISTRICT 20 UNITED MINE WORKERS OF AMERICA,
BRADLEY NIX,

Defendants-
Counter Claimants-
Appellants.

———————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 7:20-cv-00648-LSC

———————————————

Before WILLIAM PRYOR, Chief Judge, JORDAN, and ANDERSON, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to determine whether an arbitrator exceeded the scope of his authority under a collective bargaining agreement. The arbitrator interpreted the agreement to require Warrior Met Coal Mining, LLC, to establish just cause to discharge an employee for violating the agreement's four-strike attendance policy, and the arbitrator determined that just cause was not present. The district court vacated the arbitrator's award as contrary to the agreement. Because the arbitrator arguably interpreted the agreement, we must defer to his interpretation and reverse and remand with instructions to enter judgment for the union.

## I. BACKGROUND

Warrior Met Coal Mining, LLC, a Delaware company, owns and operates a coal mine in Brookwood, Alabama. Warrior mines metallurgical coal for the steel industry. United Mine Workers of America and District 20, United Mine Workers of America, Local Union 2245 are unincorporated, autonomous labor unions under

the Labor Management Relations Act. 29 U.S.C. § 152(5). The local union represents employees of Warrior in collective bargaining.

Warrior and the union are parties to a collective bargaining agreement. The agreement became effective February 3, 2016, and it was in effect at all times relevant to this appeal.

There are three articles of the agreement relevant to this appeal. The first article governs work attendance as follows:

> ARTICLE XV—MISCELLANEOUS . . .
>
> *Section (g)* Attendance Control
>
>> (1) The Employer shall administer a four (4) strike attendance policy for all absences (whether excused or unexcused). Progressive discipline under the attendance policy shall proceed as follows:
>>
>>> Strike 1 = verbal warning
>>>
>>> Strike 2 = written warning
>>>
>>> Strike 3 = suspension (minimum 2 days)
>>>
>>> Strike 4 = discharge
>>
>> (2) Employee strike counts will be reset annually on the anniversary of the employee's hire date . . . .
>>
>> (8) The only issue under this Article XV, Section (g) subject to Article XVI shall be whether the absence resulting in a strike actually occurred. . . .

The second article requires parties to attempt to settle grievances before resorting to arbitration:

> ARTICLE XVI—SETTLEMENT OF DISPUTES . . .
>
> *Section (c)* Grievance Procedure
>
> Should differences arise between the Union and the Employer as to the meaning and application of the provisions of this Agreement, or should differences arise about matters not specifically mentioned in this Agreement, . . . an earnest effort shall be made to settle such differences . . . .
>
> Disputes arising under this Agreement shall be resolved as [provided for in the arbitration procedures in this Article] . . . .

The third article governs discharges and the arbitration of discharge disputes:

> ARTICLE XVII—DISCHARGE PROCEDURE
>
> *Section (a)* Just Cause Required
>
> No Employee covered by this Agreement may be disciplined or discharged except for just cause. The burden shall be on the Employer to establish grounds for discharge in all proceedings under this Agreement.
>
> *Section (b)* Procedure

Where the Employer concludes that the conduct of an Employee justifies discharge, the Employee shall be suspended with intent to discharge and shall be given written notice stating the reason . . . . [T]he Employee shall be afforded the right to meet with the superintendent or manager of . . . [the mine where] the Employee works. . . .

*Section (c)* Suspension

If the Employer informs the Employee at the meeting . . . that [it] still intends to discharge the Employee (or if no meeting was requested), the Employee remains suspended . . . for a period of time necessary to permit him to file a grievance and have it arbitrated. . . .

*Section (d)* Immediate Arbitration

(1) If the [union] believes that just cause for discharge does not exist, it shall arrange with the Employer for immediate arbitration of the dispute, bypassing [three steps] of the grievance procedure. . . .

(3) . . . If the arbitrator determines that the Employer has failed to establish just cause for the Employee's discharge, the Employee shall be immediately reinstated to his job . . . . If the arbitrator determines that there was just cause for the discharge, the discharge shall become effective upon the date of the arbitrator's decision.

Warrior employed Bradley Nix as a miner operator. Nix belongs to the union and was represented by the union at all times relevant to this appeal. He resides in Bessemer, Alabama and began his employment at Warrior in 2016.

Nix was late to work on October 9, 2019. Nix already had three strikes under the attendance policy, so he received a fourth strike. And because it was his fourth strike, Warrior suspended Nix with intent to discharge him.

Warrior sent Nix written notice of the reasons it intended to discharge him. Nix and representatives of the union then met with Warrior, and Warrior informed Nix that it continued to intend to discharge him. The parties requested immediate arbitration.

The grievance was assigned to Samuel Stone, one of the arbitrators designated by the agreement, and an arbitration hearing was held on February 13, 2020. The arbitrator issued his decision five days later. In his decision, the arbitrator concluded that "discharge [was] too severe a penalty and [the] appropriate discipline [was] a sixty . . . working day suspension."

The arbitrator's opinion reviewed the facts underlying the grievance. The arbitrator found that Nix "clocked in at 6:59 a.m.," "was . . . dressed and ready to work [at] 7:01 a.m.," and arrived at the "safety meeting" on the porch at "7:02 a.m." Nix testified at the arbitration hearing that "he knew that he was [supposed] to be on the porch at 7:00 a.m." And the arbitrator recounted Nix's absence history, which verified that an absence on October 9, 2019, would

have been a fourth strike. The arbitrator found that "[a]ll the facts and . . . the Agreement . . . indicate that an Employee is late when he is not on the porch . . . at 7:00 a.m. dressed and ready to work." And Nix "was not on the porch . . . at 7:00 a.m. dressed and ready to work." So, the arbitrator concluded that Nix "was late."

The arbitrator acknowledged that Article XV Section (g)(8) of the agreement "provides that the only issue shall be whether the absence resulting in a strike actually occurred." He discussed two Arbitration Review Board decisions interpreting a similar clause in another agreement and concluded that the Board allowed an arbitrator to hold that the discharge provision should not have been invoked in some situations.

The arbitrator explained that "the concept of just cause" required him to determine whether the violation is a dischargeable offense, and if it was a dischargeable offense, what type of dischargeable offense it was. The arbitrator concluded that the questions under the just cause provision were whether the violation will "(1) always or 'inherently' be grounds for discharge, (2) never be grounds for discharge, or (3) sometimes be grounds for discharge." If the violation is of the third kind, "then it must be determined if discharge is just or fair . . . in view of all . . . circumstances." That determination requires the arbitrator to decide whether the violation "(a) merit[s] discharge only under certain conditions or (b) merit[s] a penalty somewhat less than discharge."

Applying this "just cause" review to the attendance policy, the arbitrator determined that having four attendance strikes is not

a "type of offense . . . which is 'inherently dischargeable.'" He concluded that "a determination as to whether [Nix] is deserving of discharge, as opposed to a suspension, depends on an analysis of the unique factual situation relating to the event." And here the arbitrator was "not convinced to discharge [Nix]" despite Nix having been late.

The arbitrator provided two reasons for his decision. First, the arbitrator concluded that Warrior itself had considered mitigating evidence in determining penalties for absences in the past and had declined to give strikes to employees who arrive late for good reason, which bolstered his conclusion that having four strikes was not an inherently dischargeable offense. Second, the arbitrator concluded that there were factors that mitigated Nix's violation. Because of those mitigating factors, the arbitrator concluded that a sixty-working-day suspension was the appropriate discipline.

Warrior filed an action to vacate the arbitration award. *See* 9 U.S.C. § 10; 29 U.S.C. § 185. In its complaint, Warrior alleged that the award did not draw its essence from the agreement, was contrary to the express language of the agreement, modified the terms of the agreement, was arbitrary "insofar as the [a]rbitrator exceeded his power to interpret and apply the [agreement] by imposing on the parties his own brand of industrial justice," was outside the scope of his authority, and failed to confine itself to matters within the arbitrator's jurisdiction. Nix and the union filed an answer and counterclaim seeking an order enforcing the arbitration award and attorney's fees and costs. Warrior answered the

counterclaim arguing that Nix and the union were entitled to no relief. The parties filed a joint stipulated record for summary judgment briefing, and the parties filed cross motions for summary judgment.

Warrior argued that the arbitrator's award must be vacated because it "contradicts the [agreement]" and the arbitrator exceeded his authority when he concluded that a fourth attendance strike was an offense that was not inherently dischargeable and considered the mitigating circumstances under a just cause analysis. Warrior argued that the arbitrator contradicted the provision in Article XV, Section (g)(8) that "[t]he only issue under this Article XV, Section (g) subject to Article XVI shall be whether the absences resulting in a strike actually occurred" and the provision in Section (g)(1) that "Strike 4 = discharge," and the arbitrator exceeded his authority in considering anything else.

The union argued that the arbitration award should be enforced. To support that argument, the union explained that the arbitrator offered a plausible interpretation of the contract when he determined that the just cause principles in Article XVII applied to a discharge under the attendance policy in Article XV. It also argued that the arbitrator's conclusion was supported by his consideration of past incidents where Warrior applied the attendance policy.

The district court granted Warrior summary judgment. The district court explained that when the arbitrator "concluded that the absence resulting in Nix receiving a Strike 4 occurred, . . . his

inquiry should have stopped." The district court reasoned that *Warrior & Gulf Navigation Company v. United Steelworkers*, 996 F.2d 279 (11th Cir. 1993), controlled because it involved a provision that granted the company authority to immediately discharge an employee for positive drug tests and concluded that an arbitrator exceeded his authority by considering anything beyond the existence of a positive drug test.

## II. STANDARD OF REVIEW

We review *de novo* a decision vacating an arbitration award. *IMC-Agrico Co. v. Int'l Chem. Workers Council of United Food & Com. Workers Union*, 171 F.3d 1322, 1325 (11th Cir. 1999).

## III. DISCUSSION

The review of arbitration decisions "is among the narrowest known to the law," *AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.*, 508 F.3d 995, 1001 (11th Cir. 2007) (internal quotation marks omitted), and our precedents make clear that two principles guide that review, *Wiregrass Metal Trades Council AFL-CIO v. Shaw Env't & Infrastructure, Inc.*, 837 F.3d 1083, 1087 (11th Cir. 2016). First, "we must defer entirely to the arbitrator's interpretation of the underlying contract no matter how wrong we think that interpretation is," and that deference "means 'the sole question for us is whether the arbitrator *(even arguably) interpreted* the parties' contract, not whether . . . []he got its meaning right or wrong.'" *Id.* at 1087–88 (emphasis added) (quoting *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013)). "If we determine that the

arbitrator (even arguably) interpreted the parties' contract, we must end our inquiry and deny a motion for vacatur." *Id.* at 1088 (internal quotation marks omitted) (alterations adopted). Second, "an arbitrator may not ignore the plain language of the contract." *Id.* (quoting *Warrior & Gulf*, 996 F.2d at 281).

"[W]e begin by looking at the relevant language in the . . . agreement and asking" if the language is open to interpretation. *Id.* Even if an agreement's language on its face is not conceivably open to interpretation, it "may nevertheless be" appropriate to give effect to an arbitration award contrary to that facially unambiguous meaning. *Id.* at 1088–89. An arbitrator may rely "upon reliable evidence of the parties' intent," like "past practices," to discover "implied . . . terms" or "to give meaning to express terms" to establish that a facially unambiguous provision is open to interpretation. *See id.* at 1088–89, 1090 (internal quotation marks omitted).

If we determine that the agreement is open to interpretation, then we must determine "whether the arbitrator . . . arguably . . . interpreted the" agreement. *Id.* at 1087–88 (quoting *Sutter*, 569 U.S. at 569); *see also id.* at 1090. We may look at the arbitrator's reasoning in making this determination. *Id.* at 1090. And if the arbitrator "engaged in a textual analysis," "attempted to give meaning to . . . terms," or "discover[ed] implied terms," then the arbitrator likely interpreted rather than modified the agreement. *Id.* There is "a strong," but "not irrebuttable, presumption that the arbitrator has interpreted the agreement instead of modifying it." *Id.* at 1092. When there is "doubt" about whether the arbitrator

interpreted the agreement, "the court must find that [the arbitrator's decision] was [an] interpretation." *Id.* at 1092 (internal quotation marks omitted).

Two provisions of the agreement leave it open to interpretation. First, the agreement provides in Article XV that absences result in a strike and that "Strike 4 = discharge." That attendance policy also provides that "[t]he only issue under . . . [the attendance policy] subject to Article XVI," which provides for "settlement of disputes" through arbitration procedures, "shall be whether the absence resulting in a strike actually occurred." Second, the agreement provides in Article XVII that *"[n]o* [e]mployee . . . may be . . . discharged *except* for just cause" and that "[i]f the [union] believes that just cause for discharge does not exist," then an "immediate arbitration" can be demanded that "bypass[es] . . . the [procedure for settlement of disputes under Article XVI]." (Emphasis added.) If the arbitrator in that "immediate arbitration" "determines that the [Warrior] has failed to establish just cause for the [e]mployee's discharge, the [e]mployee shall be . . . reinstated . . . ."

The general provision in Article XVII allowing an arbitrator to review each discharge for just cause leaves the agreement open to an interpretation that an arbitrator can review discharges based on a fourth strike under the attendance policy. That interpretation remains arguable despite the attendance policy providing that "[t]he only issue" that can be decided in an arbitration proceeding under Article XVI is "whether the absence . . . occurred." Warrior argues that the provision that states that the "only issue under [the

attendance policy] subject to [the] Article XVI [procedures for settlement of disputes] [is] whether the absence resulting in a strike actually occurred" forecloses any interpretation that an arbitrator could consider just cause in a dispute concerning a discharge based on the attendance policy. But that argument fails to account for the fact that the limitation-of-review provision in the attendance policy states that review is limited only to whether the absence happened in the context of *Article XVI* grievance procedures. The limitation does not expressly limit review under the procedures provided in *Article XVII* to determine whether there was just cause for discharge. Because the limitation does not apply to Article XVII, the just cause provisions in Article XVII at least arguably apply to any discharge, including the discharge here.

Warrior also contends that the only interpretation available to the arbitrator of the provision that "Strike 4 = discharge" is that a fourth strike is always just cause to discharge an employee, but this argument fails for two reasons. First, as we have explained, Article XVII of the agreement appears on its face to provide for a just cause determination in every case of a discharge. Second, even if we were not to rely on the generally applicable language of the just cause provisions of Article XVII, we have explained that, in cases where the language of an agreement is not on its face open to interpretation, it "may nevertheless be" appropriate to give effect to an arbitration award. *Wiregrass*, 837 F.3d at 1089 (internal quotation marks omitted).

The arbitrator relied upon "past practices," which are "reliable evidence of the parties' intent," "to give meaning to" the "Strike 4 = discharge" provision. *See id.* at 1088–89, 1090 (internal quotation marks omitted). Looking at the past practices, the arbitrator determined that the provision defined an offense that did not always constitute just cause for discharge. Because Warrior "bargained for the arbitrator's construction of [the] agreement," *Sutter*, 569 U.S. at 569 (internal quotation marks omitted), the arbitrator was permitted to use this extrinsic evidence to give the "Strike 4 = discharge" provision a meaning that might not be obvious from the plain language, *see Wiregrass*, 837 F.3d at 1088–90.

Because the arbitrator "arguably constru[ed]" the agreement, the "arbitral decision . . . must stand." *Id.* at 1087–88 (quoting *Sutter*, 569 U.S. at 569). And because the agreement is open to interpretation, we ask only whether the arbitrator "arguably interpret[ed]" it. *Id.* at 1088. The arbitrator's decision displays reasoning that this Court has said establishes that the arbitrator engaged in interpretation. When the "arbitrator's reasoning shows that [he]" attempted to "give meaning to express terms" and engaged in "analysis of the relevant terms[,] . . . that will ordinarily mean [he] engaged in interpretation, not modification." *Id.* at 1090. If there is any doubt whether this arbitrator's decision was a modification or an interpretation of the agreement, we must conclude that it is an interpretation. *Id.* at 1092.

The arbitrator's decision reveals that he engaged in arguable interpretation. The arbitrator "attempted to give meaning to

express terms" by explaining what the just cause provision meant. *Id.* at 1090. And he interpreted the just cause provisions to apply to discharges under the attendance policy. The arbitrator also "[gave] meaning to express terms . . . based on extrinsic evidence . . . such as . . . past practices," *id.*, when he determined that past practices by Warrior under the attendance policy established that a fourth strike was not a "type of offense . . . which is 'inherently dischargeable.'" The arbitrator arguably interpreted the agreement, so his arbitration award "must stand." *Sutter*, 569 U.S. at 569.

The district court held, and Warrior now argues, that our Court's decision in *Warrior & Gulf* controls this appeal. There, we held that an arbitrator exceeded his authority as a matter of law when he concluded that a discharge was not warranted despite an employee failing two drug tests and a provision of the agreement providing that "[a]n employee who tests positive a second time [for drugs] is 'subject to immediate discharge.'" *Warrior & Gulf*, 996 F.2d at 280–81. We explained that the "express language" in the agreement gave "management the complete discretion to fire an employee." *Id.* at 281. And we held that because an arbitrator "may not impose a remedy which directly contradicts the express language of the collective bargaining agreement," the arbitrator had no authority to interfere with the dismissal, despite a provision providing for arbitration of an employee who believes he was "unjustly dealt with." *Id.* at 280 n.5, 281. But we "stop[ped] short of the question of how much discretion arbitrators have in interpreting the 'just cause' provision of a contract in cases where their

interpretations do not conflict with a specific and express contractual provision." *Id.* at 281.

Warrior argues that this appeal is like *Warrior & Gulf* in two ways. First, the agreement here has an express provision allowing the company to discharge an employee because of a certain infraction. That provision reads "Strike 4 = discharge," and in *Warrior & Gulf* the agreement read "subject to immediate discharge." Second, the "just cause" provision here is similar to the "unjustly dealt with" provision in *Warrior & Gulf.* Warrior contends that "the case for vacating the arbitration award is even stronger here" because of the provision that "[t]he only issue under [the attendance policy] subject to Article XVI . . . shall be whether the absence resulting in a strike actually occurred." The dissent argues that there is a third similarity. The dissent reads *Warrior & Gulf* as a decision that considered an arbitration award that relied on "past" "actions . . . of the employer to determine whether 'just cause' existed." Dissenting Op. at 5.

We are not persuaded that *Warrior & Gulf* requires a vacatur of this arbitration award. We have since clarified the standard that governs our review of arbitration awards in the light of intervening Supreme Court precedent, and that standard is more deferential to arbitral decisions. *See Wiregrass*, 837 F.3d at 1087; *Gherardi v. Citigroup Glob. Mkts.*, 975 F.3d 1232, 1237–38 (11th Cir. 2020). As we explained in *Wiregrass Metal Trades Council AFL-CIO v. Shaw Environmental & Infrastructure, Inc.*, the Supreme Court has ruled that because "we must defer entirely to the

arbitrator's interpretation[,] . . . 'an arbitral decision even arguably construing or applying the contract must stand.'" 837 F.3d at 1087–88 (quoting *Sutter*, 569 U.S. at 569). To be sure, we also acknowledged that "an arbitrator may not ignore the plain language of the contract." *Id.* at 1088 (quoting *Warrior & Gulf*, 996 F.2d at 281).

Our "sole question" is "whether the arbitrator (even arguably) interpreted the parties' contract." *Wiregrass*, 837 F.3d at 1088 (quoting *Sutter*, 569 U.S. at 596); *accord Gherardi*, 975 F.3d at 1238. That question requires us to determine whether the language of the agreement "is open to interpretation" because "an arbitrator may not ignore the plain language of the contract." *See Wiregrass*, 837 F.3d at 1088 (internal quotation marks omitted). And we have explained that when reviewing arbitration awards, we allow arbitrators to "make errors, even . . . 'serious error[s].'" *Gherardi*, 975 F.3d at 1237 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010)). Because of the deference we give to the arbitrator's interpretation of an agreement, we can find that an agreement is "open to interpretation" even if we would not conclude that the language was open to interpretation in other contexts. *See Wiregrass*, 837 F.3d 1088–90.

Unlike the arbitrator here, the arbitrator in *Warrior & Gulf* also did not rely on "reliable evidence of the parties' intent . . . to give meaning to express terms" of the agreement. *Id.* at 1089–90. In *Warrior & Gulf*, we explained that the arbitrator contradicted the express language of an agreement that gave an employer "complete discretion to fire an employee." 996 F.2d at 281. Even if we

were to assume in this appeal that the arbitrator's award is contrary to the express language of the provision that "Strike 4 = discharge," the arbitrator is entitled to "give meaning to express terms" of an agreement even when the express term "is not facially ambiguous" by relying on "evidence of the parties' intent" like "past practices." *See Wiregrass*, 837 F.3d at 1088–90. And here, unlike in *Warrior & Gulf*, the arbitrator relied on past practices to give meaning to the attendance policy.

The dissent contends that *Warrior & Gulf* considered an arbitral award that relied on past practices. Dissenting Op. at 4–5. The dissent explains that "[i]n *Warrior & Gulf* the arbitrator considered the employer's conduct with respect to the employee's third (and negative) drug test." *Id.* at 5. But this argument misunderstands the nature of using "past practices" to interpret an agreement.

In *Warrior & Gulf*, the arbitrator considered only the specific facts of the employer's challenged conduct vis-à-vis the aggrieved employee. *Warrior & Gulf*, 996 F.2d at 280. After recounting the facts that gave rise to the employee's grievance, the arbitrator decided only that those facts did not amount to a "fair shake." *Id.* Nothing in *Warrior & Gulf* suggests that the arbitrator used either the employer's past conduct towards the aggrieved employee or the employers past treatment of other employees to *interpret* the agreement. *See id.* *Warrior & Gulf* did not hold that an arbitrator is barred from using past practices to *interpret* such provisions. That kind of holding would have created an odd discharge-for-just-

cause exception to the general rule, *see Loveless v. E. Air Lines, Inc.*, 681 F.2d 1272, 1280 (11th Cir. 1982), that arbitrators are entitled to rely upon past practices to interpret express terms of agreements.

Our understanding of *Warrior & Gulf* is confirmed by our precedent. In *Wiregrass*, we explained the *Warrior & Gulf* is consistent with the principle that an arbitrator construes an agreement when he relies on "past practices" to interpret a facially unambiguous agreement. *See* 837 F.3d at 1088–90. As *Wiregrass* makes clear, an arbitrator has "not ignore[d] the plain language of the" agreement, *Warrior &Gulf*, 996 F.2d at 281 (internal quotation marks omitted), when an arbitrator attempts to "give meaning to express terms . . . based on . . . evidence of the parties' intent, such as . . . past practices." *Wiregrass*, 837 F.3d at 1090. Instead, when an arbitrator relies on past practices to give meaning to express terms, the arbitrator "arguably constru[es]" the agreement, *id.* at 1087–88, even where the express terms the arbitrator interprets govern just cause to discharge employees.

This agreement also more plausibly provides for just cause review of discharges under the attendance policy than the agreement at issue in *Warrior & Gulf*. The attendance policy specifically limits the ability of arbitrators to review issues under the policy when the grievance follows the normal arbitration procedure in Article XVI. But the agreement provides a different procedure for arbitrating discharges in Article XVII, and the attendance policy is silent as to the application of Article XVII. Further, as evidenced by

the request for "immediate arbitration," which bypasses additional procedures of Article XVI, it appears the parties contemplated that the procedures in Article XVII applied to discharges under the attendance policy. If the parties arguably meant that the procedures in Article XVII applied to discharges under the attendance policy, it is at the very least an arguable interpretation that the substantive provision for just cause review in Article XVII also applied.

Because the arbitrator arguably interpreted the agreement, "we must end our inquiry and deny a motion for vacatur." *Id.* at 1088 (alterations adopted) (internal quotation marks omitted). We reiterate that when parties bargain for arbitration, their "bargain is for the arbitrator's construction of the . . . agreement[]." *Gherardi*, 975 F.3d at 1237 (citing *Sutter*, 569 U.S. at 569). And when parties receive the benefit of that bargain, we must decline to "convert arbitration losses into court victories." *Wiregrass*, 837 F.3d at 1092 (internal quotation marks omitted).

## IV. CONCLUSION

We **REVERSE** the judgment and **REMAND** with instructions to render judgment for the union.

21-10523                JORDAN, J., Dissenting                    1

JORDAN, Circuit Judge, dissenting:

This is, in the parlance of our industry, a "soft" dissent.

I was on the panel in *Wiregrass Metal Trades Council AFL-CIO v. Shaw Env't & Infrastructure, Inc.*, 837 F.3d 1083 (11th Cir. 2016), and joined the court's opinion in full. So it will not come as a surprise that I agree with most of what is set out in today's majority opinion. But I do not believe that our earlier decision in *Warrior & Gulf Navigation Co. v. United Steelworkers*, 996 F.2d 279 (11th Cir. 1993), can be distinguished. Although I regard *Warrior & Gulf* as having been wrongly decided, I think the district court correctly concluded that it required vacatur of the arbitrator's decision.

## I

For an intermediate appellate court like ours, "an earlier horizontal precedent nearly always rules." Bryan A. Garner, *The Law of Judicial Precedent* 303 (2016). As we have explained many times, *see, e.g., CSX Transportation, Inc. v. General Mills, Inc.*, 846 F.3d 1333, 1338 (11th Cir. 2017), a panel is bound by the holding of an earlier (and published) Eleventh Circuit case unless it has been abrogated by the Supreme Court or by us sitting en banc. With that in mind, I summarize *Warrior & Gulf* to see how close it is—factually, procedurally, and doctrinally—to the dispute before us.

Like this case, *Warrior & Gulf* involved an employer's federal court challenge to an arbitral decision setting aside the discharge of an employee (who was a union member) pursuant to a

collective bargaining agreement.  Here are other similarities be-tween the cases (using regular font for *Warrior & Gulf,* italics for this case, and bold for the similarities).

◆ The agreement in *Warrior & Gulf* provided in § 23(b) that an employee who had a second positive drug test was "subject to immediate discharge."  996 F.2d at 280 & n.4.  *The agreement here states in Article XV(g) that a person with a fourth "strike" for an attendance violation can be discharged ("Progressive discipline un-der the attendance policy shall proceed as follows: . . . . Strike 4 = discharge[.]").*  **So both agreements expressly permitted the em-ployer to discharge an employee for a specified violation.  In other words, discharge was a form of discipline baked into each of the agreements for the violations in question.**

◆ A separate provision of the agreement in *Warrior & Gulf*, § 14, stated that the employer had the "right to" discharge for "proper cause."  996 F.2d at 280 & n.5.  Another provision, § 13, allowed for arbitration of a contested discharge: "In the event a member of the Union shall be discharged . . . and believes he has been unjustly dealt with, such discharge shall constitute a case aris-ing under the method of adjusting grievances herein provided.  In the event it should be decided under the rules of the [a]greement that an injustice has been dealt the employee with regard to the discharge, the Company shall reinstate such employee . . . ."  *Id.* We interpreted the language in these two provisions to "suggest[ ] that [the employer] must have 'just cause' to fire an employee." 996 F.2d at 280.  *The agreement here states in Article XVII(a) that*

21-10523                JORDAN, J., Dissenting                3

"[n]o employee covered by this [a]greement may be disciplined or discharged except for just cause," and Article XVII(d) provides that if the union "believes that just cause for discharge does not exist, it shall arrange with the Employer for immediate arbitration of the dispute." Both agreements, then, (a) required "just cause" for the discharge of an employee, and (b) provided for arbitration if the employee or the union asserted that "just" cause did not exist.

◆ In *Warrior & Gulf*, the employer discharged an employee with a second positive drug test pursuant to the progressive discipline set out in the agreement. *See* 996 F.2d at 280. *Here the employer discharged an employee for a fourth attendance violation (a fourth "strike") pursuant to the progressive discipline set out in the agreement.* In both cases, therefore, the employee committed a violation that, pursuant to the respective agreement, could result in discharge. And in both cases, the employer discharged the employee as authorized by the progressive discipline set out in the agreement.

◆ The union in *Warrior & Gulf* challenged the employee's discharge and invoked arbitration, arguing that there was no "just cause" for the discharge. *See* 996 F.2d at 280. *The union here likewise challenged the employee's discharge and sought arbitration, arguing that there was no "just cause" for the discharge.* Thus, in both cases the union contested the discharge in an arbitration proceeding by invoking the separate "just cause" provision in the agreement.

◆ The arbitrator in *Warrior & Gulf* found that the employee had indeed tested positive for drugs a second time. *See* 996 F.2d at 280. *The arbitrator here similarly found that the employee had committed the attendance violation in question, so that he had a fourth "strike" under the agreement.* **In both cases, therefore, the arbitrator found that the employee committed the specified violation which allowed for discharge.**

♦ The arbitrator in *Warrior & Gulf* ruled that, despite the employee's violation, there was no "just cause" for the discharge. The arbitrator concluded that the "[a]greement's just cause provision required the [employer] to use 'just and equitable' procedures in its decision to fire an employee." 996 F.2d at 280. Because the employer had asked the employee to take a third drug test (which was negative) before it had the results of the second test, it "in effect was telling [the employee] that the [third] test was the one on which [his] continued employment would hinge. [The employee] passed the [third] test. Accordingly, the [employer] . . . failed to establish just cause for discharge by clear and convincing evidence." *Id.* *The arbitrator here similarly concluded that, notwithstanding the violation (the fourth "strike"), the employer did not have "just cause" to discharge the employee. Interpreting the "just cause" provision in the agreement to mean that a violation may merit discharge only under certain conditions or may merit a penalty less than discharge, he ruled that discharge was not appropriate because (1) the employer had in the past considered mitigating evidence in determining penalties for absences and had declined to*

21-10523          JORDAN, J., Dissenting          5

give "strikes" to employees who arrived late for good reason, and (2) there were factors that mitigated the employee's violation. Instead of discharge, the arbitrator ordered a 60-day suspension. The arbitrators in both cases ruled that that there was no "just cause" for the dismissal under the agreement. And both arbitrators focused on the actions (past and present) of the employer to determine whether "just cause" existed. In *Warrior & Gulf* the arbitrator considered the employer's conduct with respect to the employee's third (and negative) drug test, and here the arbitrator considered the employer's past treatment of absences and the mitigating circumstances that existed as to the employee's violation.

♦ In *Warrior & Gulf*, the employer sought to vacate the arbitral ruling in the district court. *Here the employer also sought to vacate the arbitral ruling in the district court.* In both cases the employer asked the district court to vacate the arbitrator's decision, making the procedural posture of the cases the same.

## II

For me, *Warrior & Gulf* is so far factually and procedurally indistinguishable. I now turn to what the panel in *Warrior & Gulf* held.

## A

The district court in *Warrior & Gulf* agreed with the employer and ordered vacatur of the arbitrator's decision. It "concluded that the arbitrator *had no discretion* to find that [the employer] lacked 'just cause' in discharging [the employee] when the

express terms of the contract [the collective bargaining agreement] granted [the employer] such authority under the facts determined by the arbitrator." 996 F.2d at 280 (emphasis added).

In a short opinion, we affirmed the district court's order vacating the arbitrator's decision. We did so by applying the principle that an arbitrator "may not impose a remedy which directly contradicts the express language of the collective bargaining agreement." *Id.* at 281 (quoting *Bruno's Inc. v. United Food & Com. Wkrs. Int'l*, 858 F.2d 1529, 1531 (11th Cir. 1998)). Because the agreement expressly provided for discharge upon a second positive drug test, we held that the arbitrator went beyond the terms of the agreement to decide the "just cause" issue once he found that the employee had a second positive test: "The [a]greement says that an employee who tests positive a second time is 'subject to immediate discharge.' This express language gives management the complete discretion to fire an employee. Once [the arbitrator] had found that, as a matter of fact, [the employee] tested positive for drugs for the second time . . . , these express terms required [him] to uphold management's decision." *Id.*

Significantly, we rejected the union's argument that "the 'subject to immediate discharge' language did not *require* [the employer] to fire [the employee]," explaining that "[f]or present purposes . . . it is enough that [the employer] had the complete discretion to fire [the employee]. Because [the employer] had, given the facts, complete discretion to fire [the employee], [the arbitrator] *had no discretion* to interfere." *Id.* at 281 n.7 (emphasis added).

Finally, we explained that a second positive drug test provided "just cause" for termination because that conduct and its attendant discipline were expressly set out in the agreement. "Because the [a]greement expressly addresses the particular contingency of a second positive drug test, we conclude that the [a]greement's 'just cause' standard is consistent with this explicit provision. The [a]greement allowed [the employer] to conducts [the drug tests] when it did, and to discharge [the employee] for the positive result from the [second] test. Under these circumstances, we conclude as a matter of law that [the employer], pursuant to the terms of the pertinent agreement, had 'just cause' to fire [the employee]." *Id.* at 281. In so holding, we expressly distinguished prior cases (like *Florida Power Corp. v. IBEW*, 847 F.2d 680, 682–83 (11th Cir. 1988), and *Sullivan Long & Hagerty, Inc. v. Local 559*, 980 F.2d 1424, 1430 (11th Cir. 1993)) which had "allowed arbitrators to consider 'just cause[.]'" 996 F.2d at 281 n.8. Those cases, we explained, "did not involve a situation (like second-time drug use) in which the company's collective bargaining agreement plainly and explicitly allowed the company to fire the employee." *Id.* "We allowed arbitrators to apply background labor law principles [in those cases], but also reaffirmed the principle that arbitrators must follow the express terms of collective bargaining agreements." *Id.*

The arbitrator here found that the employee had a fourth "strike" for an attendance violation. Given that finding, the district court concluded that under *Warrior & Gulf* the arbitrator did not have the authority (i.e., the discretion) to set aside the dismissal on

"just cause" grounds because the penalty of discharge for a fourth "strike" was expressly authorized by (i.e., baked into) the agreement: "Like in *Warrior [& Gulf]*, where there was an express provision in the [agreement] regarding termination for a failed drug test, this [agreement] has an express provision providing for termination when an employee obtains his fourth strike." D.E. 28 at 10.[1]

I think the district court got it right. As in *Warrior & Gulf*, the agreement here specifically provided for discharge for a specified violation—a fourth attendance "strike." As in *Warrior & Gulf*, the arbitrator found that the employee committed the alleged violation (i.e., he had a fourth "strike"). And, as in *Warrior & Gulf*, given that finding, the arbitrator did not have the discretion to rely on the separate "just cause" requirement to set aside the employee's discharge. Indeed, the language we used in *Warrior & Gulf* fits like a glove here: "Because the [a]greement [here] expressly addresses the particular contingency of a [fourth attendance 'strike'], . . . the [a]greement's 'just cause' standard is consistent

---

[1]The district court here provided an alternative reason for its decision – that Article XV, the portion of the agreement providing for termination for a fourth attendance "strike," "specifically provides that the only issue that can be submitted to arbitration [under Article XVI] is whether the absence resulting in the strike occurred." D.E. 28 at 10. I agree with the majority that, because this "only issue" provision in Article XV does not expressly mention Article XVII (the portion of the agreement which requires "just cause" for terminations), it arguably does not displace Article XVII. But that only means that the "just cause" provision is in play. And as explained in the text, *Warrior & Gulf* affirmed the vacatur of the arbitrator's decision in the face of such a "just cause" provision.

with this explicit provision," and as "a matter of law . . . [the employer], pursuant to the terms of the . . . agreement, had 'just cause' to fire [the employee]." 996 F.2d at 281. In other words, once the arbitrator "found . . . as a matter of fact" that the employee had a fourth "strike," he lacked discretion to apply the "just cause" provision and was "required . . . to uphold management's decision." *Id.*

## B

This reading of *Warrior & Gulf* is not new. Nor is it revolutionary. In *IMC-Agrico Co. v. Int'l Chem. Workers Council*, 171 F.3d 1322, 1327 (11th Cir. 1999)—where we reinstated an arbitral decision setting aside the discharge of an employee on "just cause" grounds—we distinguished *Warrior & Gulf* as a case where the agreement had "a provision to the effect that certain identified types of employee conduct always provide just cause for discharge." The majority tellingly does not address our characterization of *Warrior & Gulf* in *IMC-Agrico*.

And in a recent unpublished case, in which we declined to overturn the decision of an arbitrator reinstating a discharged employee, we similarly characterized *Warrior & Gulf* and distinguished it:

> But we see daylight between *Warrior & Gulf* and this case. That contract included the express (and apparently complete) terms of the drug-testing policy, spelling out each provision in some detail. In other words, the contract included the specifics of the

policy. Here, by contrast, the language in the contract is more skeletal. The parties agreed to create a random drug-testing plan, listed "elements" of that plan that would apply, and included among those elements "[d]ischarge for a positive test result." That, though, is not a contract that clearly and expressly gave management unfettered discretion to fire any employee with a positive result—it's a contract that spelled out some general terms and punted on particulars until a fleshed-out policy could be crafted.

That is a difference in both kind and degree. As to kind, *Warrior & Gulf* involved a fully realized drug testing policy that was written into the contract. Here, we have only a promise to promulgate a random drug-testing policy in the future and some preliminary pieces of that plan's framework. And as to degree, the language in *Warrior & Gulf* was much more particularized. The *Warrior & Gulf* Court emphasized that the contract there "expressly addresse[d] the particular contingency of a second positive drug test." 996 F.2d at 281. The language in this contract is much less specific, as one might expect for an "element" of a plan that the parties agree will be implemented later.

*Georgia-Pacific Consumer Ops., L.L.C. v. United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial*

21-10523                JORDAN, J., Dissenting                11

*and Service Workers Union, Local 9-0952*, 836 F. App'x 773, 778–79 (11th Cir. 2020).[2]

We are not, by the way, alone in reading *Warrior & Gulf* in this way. In *LB & B Associates, Inc. v. I.B.E.W., Local No. 113*, 461 F.3d 1195, 1999 (10th Cir. 2006), the Tenth Circuit—while disagreeing with *Warrior & Gulf* in a 2-1 decision—similarly described it as one of several cases which "found that the violation of a specific provision authorizing discharge is *de facto* 'just cause' for termination such that an arbitrator's award reinstating an employee cannot stand." Commentators also seem to agree with this understanding of *Warrior & Gulf*. *See, e.g.,* Kevin B. Zeese, Drug Testing Legal Manual § 5.20 (2d ed. & Nov. 2021 update) ("The court [in *Warrior & Gulf*] held that once the arbitrator found the test result was accurate he could not reinstate the employee because the terms of the contract expressly allowed for discharge after two positive tests."); Benton Mathis, *Labor Law*, 45 Mercer L. Rev. 1321, 1326 (1994) ("Regardless of 'just cause,' the Eleventh Circuit [in *Warrior & Gulf*] found that the plain language of the [a]greement gave the employer the unfettered right to discharge an employee who had tested positive a second time during his employment.").

*Warrior & Gulf* holds that, where the agreement itself lists discharge as permissible discipline for a specified violation or infraction, and the employee has engaged in the prohibited conduct, an

---

[2] I was on the panel in *Georgia-Pacific*, just as I was on the panel in *Wiregrass Metal Trades*.

arbitrator has "no discretion to interfere" by applying and interpreting the agreement's separate "just cause" provision to set aside the dismissal. *See Warrior & Gulf*, 996 F.2d at 281 n.7. Stated differently, when discharge is expressly permitted for certain specified conduct by the agreement—a contract bargained to the by the employer and the union—that discipline necessarily constitutes "just cause" under the agreement. *See id.* at 281 ("We stop short of the question of how much discretion arbitrators have in interpreting the 'just cause' provision of a [collective bargaining agreement] in cases where their interpretations do not conflict with a specific and express contractual provision. *Because the [a]greement expressly addresses the particular contingency of a second positive drug test, we conclude that the [a]greement's 'just cause' standard is consistent with this explicit provision.*") (emphasis added). That, I believe, is the scenario we have here—"no discretion" means no discretion.

## C

The majority puts a great deal of weight on *Wiregrass Metal Trades*. That case, however, is different in a significant way. The collective bargaining agreement in *Wiregrass Metal Trades* provided that an employee was subject to termination if he possessed government property without proper authorization. The arbitrator ruled that an employee could violate this provision only if he knew that the property was stolen. *See* 837 F.3d at 1086. Because the employee in question did not know that the property he possessed belonged to the government and did not know that the

property had been stolen, the arbitrator concluded that that the employee did not commit the violation and that the employer could not fire the employee. The question for us was whether the arbitrator had exceeded his authority in reading a knowledge requirement into the provision prohibiting possession of government property without proper authorization. *See id.* at 1086-87. Concluding that the arbitrator was arguably interpreting the provision, we held that the district court erred in vacating her decision. *See id.* at 1091-93.

So *Wiregrass Metal Trades* is not a case in which an arbitrator invoked the "just cause" provision of a collective bargaining agreement to set aside a termination for a contractually-specified violation. It is, instead, a case in which the arbitrator interpreted the provision which set out certain workplace misconduct and then, based on her interpretation, found that the employee had not committed the alleged violation. As opposed to in our case and in *Warrior & Gulf*, where the arbitrator found that the employees did commit the alleged violations. Indeed, we even explained in our *Wiregrass Metal Trades* opinion that "[i]f the arbitrator found that [the employee] had violated the possession policy but nonetheless ordered [the employer] to reinstate him and impose a reprimand instead of termination, the arbitrator would have amended the agreement and exceeded the scope of her authority." *Id.* at 1090.

14                    JORDAN, J., Dissenting                    21-10523

Though that language describes *Warrior & Gulf* and this case to a "t," it is nowhere to be found in the majority opinion.[3]

## III

I've been wrong before, and I could be mistaken about the breadth and import of *Warrior & Gulf*. But even if I am, it still seems to me that it will be very difficult for district courts to meaningfully distinguish between that case and the decision we issue today. That exercise, I fear, will be similar to the exercise of answering "the question of how many angels can dance on the head of a pin." *Petersen v. Atlanta Housing Authority*, 998 F.2d 904, 915 n.24 (11th Cir. 1993).

Respectfully, and reluctantly, I dissent.

---

[3] Given their different facts, *IMC-Agrico* and *Wiregrass Metal Trades* are distinguishable from *Warrior & Gulf* (as well as from this case). But to the extent that *IMC-Agrico* and *Wiregrass Metal Trades* are in some way inconsistent with *Warrior & Gulf*, we are required to follow *Warrior & Gulf* as the earliest decision with similar facts. *See, e.g., Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1072 (11th Cir. 2000). I recognize, of course, that *Warrior & Gulf* has been criticized, *see, e.g., LB & B Associates*, 461 F.3d at 1199–1200, and that there are cases coming out the other way on almost-identical facts, *see, e.g., Arco-Polymers, Inc. v. Local 8-24*, 671 F.2d 752, 752–53, 755–57 (3d Cir. 1982), but as an Eleventh Circuit panel we are bound by *Warrior & Gulf* even if it was wrongly decided.